Filed 3/15/21  P. v. Honablezh CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089253 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE015475) |
| v. | |
| SEKOU TOURE HONABLEZH, | |
| Defendant and Appellant. | |

Defendant Sekou Toure Honablezh robbed two victims of their bikes and belongings at knife point.  At the scene of the incident, one of the victims told an officer what happened; this conversation was recorded on the officer's body camera.  At trial, the victim did not testify but the video of her conversation with the officer was admitted.  Defendant was found guilty of robbery, assault with a deadly weapon, and dissuasion of a witness through threat of force.  On appeal, defendant argues that admitting the victim's statement to police violated the confrontation clause of the Sixth Amendment to the

1

Federal Constitution because the statements were testimonial. Agreeing with defendant, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Early one morning defendant and codefendant Jacklyn Patrick encountered Stacy G. and Jamal M. on a bike trail. Defendant grabbed Stacy around the neck, held a knife to her throat, and demanded she and Jamal give him everything. After defendant and Patrick took Jamal's and Stacy's backpacks and bikes, Jamal and Stacy flagged down a truck and used the driver's phone to call 911. The 911 call was made at 6:49 a.m.

Two police officers initially responded to the call, describing the scene as "pretty chaotic at first." They saw defendant riding a bike and holding another and ordered him to get off the bike and get down on the ground. Defendant began heading away from them towards Stacy and Jamal, who were about 50 to 75 yards away. Stacy and Jamal started running away from defendant. The two officers detained and handcuffed defendant. Another officer detained Patrick who had walked about 100 yards in the opposite direction of defendant, other officers, and the victims. One officer heard someone, maybe Jamal, say the defendant had a gun. But the other officer did not remember hearing anything about a gun.

After these officers had detained defendant, Officer Maryna Stanionis arrived at the scene at about 7:05 a.m. One of the officers was speaking with Jamal and asked Officer Stanionis to speak to Stacy. Officer Stanionis first made sure defendant was "detained properly and was no longer a threat" to the other officers and then spoke with Stacy at around 7:10 a.m., taking her 20 feet or so from the other officer and Jamal. Stacy appeared "freaked out," "terrified," and "jumping all over the place talking extremely fast, very scattered" and had cuts on both of her knees. Officer Stanionis spoke with Stacy and she described what occurred.

Stacy did not testify at trial[1] but Officer Stanionis wore a body camera during her interview of Stacy and portions of this video were played at trial after the court held an Evidence Code section 402 hearing on the statements, which we discuss *post*. The video's transcript of the portion admitted at trial stated:

"[Officer Stanionis]: There's another vic- I guess there's another victim that Asvitt's with.

"Dispatch: (Unintelligible) 11 I'm out with another party involved in this whole situation.

"[Officer Stanionis]: Southward.

"Dispatch: Uh, north of the park.

"[Officer Stanionis]: Southward.

"Dispatch: (Unintelligible) catch a plate - 7 William Union Frank 9 (unintelligible).

"[Officer Stanionis]: Okay. Are you hurt?[2]

"[Stacy]: Yeah (unintelligible) he (unintelligible) my neck.[3]

"[Officer Stanionis]: Who had a gun?

"[Stacy]: No one had a gun. We don't have a gun.

"[Officer Stanionis]: Okay.

---

[1] The record does not disclose the reason for Stacy not testifying at trial.

[2] This is when Officer Stanionis begins speaking with Stacy, after talking with dispatch through her radio.

[3] In the video, Stacy briefly shows Officer Stanionis her neck, but no injury is readily apparent.

"[Stacy]: We walked down the street me and him (unintelligible) the dude riding bikes. He goes there he goes you guys are sisters right? And we're like we (unintelligible) I said – I was.

"[Officer Stanionis]: Take a deep breath. Thanks for coming.[4]

"[Stacy]: (Unintelligible) right? So we're like (unintelligible) he's like oh you got any weed? I said no we ain't got no weed. Then we made a joke I said oh yeah we got weed. And we walked away and he's like give me that weed. I was like we ain't got no weed. So that's when he starts like trying to stab us – stab me and he pushed me down. He has my bike. Him and his girl. The girl was – the heavy set lady. She's like just give him everything. I was like we don't have nothing. Took my bag – he ripped the fucking bag. He fucking tried to stab me.

"Dispatch: Bravo 35 from (unintelligible).

"[Officer Stanionis]: Go ahead.

"[Stacy]: He broke my (unintelligible) broke my bag – he (unintelligible) bike.

"[Officer Stanionis]: He was with the heavy set girl?

"[Stacy]: Yeah. She's right over there.[5] She took off on the bike when – while they were (unintelligible).

"Dispatch: Yeah I opened the gate in Discovery Park for the bike trail there and (unintelligible) did you lock it on your way back out?

"[Stacy]: (Unintelligible) this bags.

"[Officer Stanionis]: A black girl?

---

**4** Officer Stanionis says "Thanks for coming" to an officer driving away in a police car.

**5** Stacy points down the bike trail to the other group of police.

4

"[Stacy]:  A Mexican chick.  Fat Mexican chick.  That's that dude's bag right there and mine's the – mine's the purple one.  It says, um, uh, oh it's purple and a little smaller than a mini bike but that's that dude's backpack there.

"[Officer Stanionis]:  Okay.  Take a deep breath.

"[Stacy]:  I have anxiety attacks really bad.

"[Officer Stanionis]:  Okay.  Take a deep breath.

"[Stacy]:  And he's all – he's all I know who you are.  He's all I know who you are – I see your face.  He's like if I see you out here and you call the police I'm gonna kill you.  So he got – he started threatening me – I mean he made death – death threats to me, uh, we're not nothing we're just (unintelligible) down here.  I don't even know him for nothing. I don't.  He's like I know your face – I said what's my name?  He goes I'll stab you – we (unintelligible) back and forth back and forth.

"[Officer Stanionis]:  Okay.

"[Stacy]:  She's got my other phone.  There's my knife.

"[Officer Stanionis]:  Wait.  Don't grab that right in front of a police officer. Come on.

"[Stacy]:  Sorry.

"[Officer Stanionis]:  Don't do that.

"[Stacy]:  Okay sorry."

Defendant was charged with two counts of robbery (Pen. Code, § 211),[6] one count of assault with a deadly weapon (§ 245, subd. (a)(1)), and one count of dissuading a witness with the enhancement it was done with threat of force or violence (§§ 136.1, subd. (b)(1), 136.2, subd. (c)(1)).  It was also alleged defendant personally used a deadly

---

[6]  Undesignated statutory references are to the Penal Code.

and dangerous weapon in commission of the robberies and witness dissuasion (§ 12022, subd. (b)(1)), he had five prior prison terms (§ 667.5, subd. (b)), and two prior serious felony convictions (§ 667.5, subd. (a)). The jury found defendant guilty on all counts and found true all enhancements except the use of a deadly weapon enhancement for the dissuasion conviction.

In a bifurcated hearing, the trial court found the prior conviction allegations true, with the exception of one, which was withdrawn by the prosecution, and granted defendant's motion to strike the prior prison and prior serious felony convictions. The court sentenced defendant to 25 years to life on all four counts, staying the sentence on the assault with a deadly weapon conviction, and imposed a year for each personal use of a firearm for a total indeterminate term of 75 years to life and determinate term of two years.[7]

## DISCUSSION

Defendant argues the trial court's admission of Stacy's statements violated the Sixth Amendment's confrontation clause. He contends the statements were testimonial because the emergency had abated, the scene was controlled, and Officer Stanionis was eliciting information on past events. As a testimonial statement, defendant had a constitutional right to confront Stacy even if the statements were admissible under state evidentiary rules; and the admission of Stacy's statements was prejudicial. He argues that even if the statements are nontestimonial, his conviction for witness dissuasion violates due process because it was entirely based on one hearsay statement.

---

[7] The People note the clerk's minutes mistakenly state the jury returned a true finding on the weapon allegation for witness dissuasion and the abstract of judgment mistakenly lists counts 2 and 4 as concurrent rather than consecutive. Because we are reversing the judgment and remanding for retrial, these errors do not require correction.

6

The People counter Stacy's statements were nontestimonial because Officer Stanionis's primary purpose in speaking with Stacy was to investigate an ongoing emergency. Officer Stanionis arrived onto a chaotic scene while defendant was still being detained, and spoke to Stacy, who was clearly agitated, to discern who was involved and what was happening. Further, Stacy volunteered the bulk of her statements without any prompting from Officer Stanionis. Defendant's arguments are more persuasive.

**Additional Background**

Prior to trial, the court held an evidentiary hearing on admitting Stacy's statements to Officer Stanionis given that Stacy would not be testifying. Officer Stanionis testified at the hearing, consistent with her trial testimony, that she did not begin talking with Stacy until defendant was detained. She did not have an independent recollection, but stated she "wouldn't have walked away from the two [other officers] without [defendant] being fully secured and detained." Officer Stanionis also knew other officers were with Patrick, though she also could not remember if she knew whether Patrick was a victim or another suspect. The other officers then asked her to speak with Stacy, which Officer Stanionis understood to mean that she would take Stacy's statement.

Officer Stanionis explained Stacy was "extremely shaken up" and "was trying to get out the information about what had happened." It was a "very active scene" and she first wanted to know whether Stacy was hurt and if she needed to get Stacy medical attention as she noticed cuts on Stacy's knees. Officer Stanionis also testified she asked about a gun because she was "trying to assess the scene for officer safety. [She did]n't remember if [she] specifically had information that there was a gun or if [the officers] were just going off of the robbery aspect of" the incident.

Officer Stanionis confirmed she was "absolutely" still "assessing the scene" and did not know who exactly was a suspect or a victim. She did know Patrick was with other officers, but she didn't know Patrick was a suspect until Stacy said Patrick was

7

involved.  Officer Stanionis also testified she was still responding to the ongoing emergency when she was told to contact Stacy.  Normally, Officer Stanionis begins witness statements with asking what happened and then letting the witness talk.  For Stacy, Officer Stanionis testified she was not taking her statement until she asked "where did this whole thing start," which she asked shortly after telling Stacy to not pick up her knife and had Stacy sit down.

The trial court ruled admissible the initial portion of Stacy's interview, until right before Officer Stanionis asked "where did this whole thing start."  The court found these initial statements to be spontaneous under state law and nontestimonial under the confrontation clause because Officer Stanionis was assessing the scene and the primary purpose of the interview was to determine whether there was still an emergency.

**The Confrontation Clause**

The confrontation clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.)  The confrontation clause only applies to testimonial statements.  In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177], the Supreme Court concluded, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . .  Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination." (*Id.* at p. 68.)  Thus, to satisfy the confrontation clause, testimonial statements cannot be admitted unless (1) the witness was unavailable and (2) the defendant had a prior opportunity for cross-examination.  (*Id.* at p. 40; *Davis v. Washington* (2006) 547 U.S. 813, 821 [165 L.Ed.2d 224] (*Davis*).)  *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " (*Crawford*, at p. 68.)

8

The Supreme Court defined testimonial in *Davis, supra*, 547 U.S. 813, and its companion *Hammon v. Indiana* (case No. 05-5705) (*Hammon*). In these cases, the court established, "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.)

Applying this framework, the Supreme Court found the statements in *Davis* nontestimonial but the statements in *Hammon* testimonial. In *Davis*, a victim of domestic abuse called 911 during an attack and described what was happening by responding to the operator's questions, including identifying the defendant. (*Davis, supra*, 547 U.S. at pp. 817-818.) The court found these were nontestimonial because the victim "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events.' " (*Id.* at p. 827.) "[T]he circumstances of [the victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying*. . . . [citation] . . . No 'witness' goes into court to proclaim an emergency and seek help." (*Id.* at p. 828.)

In *Hammon*, police responded to a domestic abuse call and first found the wife outside, appearing " 'somewhat frightened' " but she said nothing happened. (*Davis, supra*, 547 U.S. at pp. 819-820.) When an officer interviewed her separately inside the home, asking " 'what had occurred,' " she detailed physical abuse by her husband, describing the abuse in a battery affidavit. (*Id.* at p. 820.) The Supreme Court found these were "easi[ly]" testimonial because "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct" and there "was no emergency in progress; the interrogating officer testified that he had

heard no arguments or crashing and saw no one throw or break anything." (*Id*. at p. 829.) When the officer interviewed her, "he was not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." (*Id*. at p. 830.) It did not matter it was not a formal interrogation at a police station, the statements recounted "how potentially criminal past events began and progressed" and "took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Ibid*.)

The Supreme Court further clarified the testimonial analysis in *Michigan v. Bryant* (2011) 562 U.S. 344 [179 L.Ed.2d 93] (*Bryant*). There, police interviewed a gunshot victim at a gas station while he was lying on the ground next to his car. "The police asked him 'what had happened, who had shot him, and where the shooting had occurred.' " (*Id*. at p. 349.) The victim told them he was shot at the defendant's house, and the police left to investigate after emergency medical services arrived; the victim died shortly after. (*Id*. at pp. 349-350.)

The Supreme Court's analysis focused on the meaning of an "ongoing emergency" and whether it "extends beyond an initial victim to a potential threat to the responding police and the public at large." (*Bryant, supra*, 562 U.S. at p. 359.) It first determined courts must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." (*Ibid*.) "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." (*Id*. at p. 360.) The court also determined the existence of an ongoing emergency "is among the most important circumstances informing the 'primary purpose'

10

of an interrogation" because it helps discern whether the participants are concerned with "something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' " (*Id.* at p. 361.) But existence of an emergency is not the only factor and is to be considered along with other factors such as the formality of the interrogation and the statements and actions of the declarant and interrogator. For the latter, the court confirmed the actions and statements of both participants in the interrogations must be examined to confirm the interview's primary purpose. (*Id*. at pp. 366-367.)

The *Bryant* court determined the dying victim's statements to police were primarily to address an ongoing emergency and therefore were nontestimonial. From the victim's perspective, the Supreme Court could not say a person in the victim's "situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' " (*Bryant, supra*, 562 U.S. at pp. 375.) From the police's perspective, they were responding to a gunshot call and were trying to "solicit[] the information necessary to enable them 'to meet an ongoing emergency.' " (*Id*. at p. 376.) The court also found the interrogation's informality was akin to the 911 call in *Davis*. Thus, "[b]ecause the circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency,' [citation], [the victim's] identification and description of the shooter and the location of the shooting were not testimonial hearsay." (*Id.* at pp. 377-378.)

Our state's high court distilled *Bryant*'s analysis into six factors to consider in determining the primary purpose of the challenged statement: (1) the circumstances of the encounter along with the statements and actions of the parties, inquiring not as to the subjective or actual purpose of the individuals involved in the encounter, but rather the purpose that reasonable participants would have had based on the participants' statements and actions; (2) whether objectively there was or appeared to be an ongoing emergency; (3) whether an ongoing emergency existed is a highly context-dependent inquiry; (4) the

11

medical condition of the declarant, which bears on both the injured declarant's purpose in speaking and the potential scope of the emergency; (5) whether a nontestimonial encounter addressing an emergency evolved, converting subsequent statements into testimonial statements; and (6) regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition. (*People v. Blacksher* (2011) 52 Cal.4th 769, 813-815.)

**Standard of Review**

On appeal, we independently review whether an otherwise admissible pretrial hearsay statement was testimonial such that its admission would violate the confrontation clause. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.) This standard of review is particularly appropriate here, where we have had the benefit of reviewing the video of Officer Stanionis and Stacy's discussion. (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964.)

**Analysis of Stacy's Statements**

The People do not dispute that Stacy was unavailable nor that defendant had no prior opportunity to cross-examine her. Thus, to satisfy the confrontation clause it must be shown Stacy's statements were nontestimonial.[8] We conclude portions of Stacy's statements to Officer Stanionis admitted at trial were testimonial.

---

[8] The People also argue the confrontation clause is satisfied because the statements meet the spontaneous statements hearsay exception under California Evidence Code section 1240. This is incorrect. To be admissible under the confrontation clause, statements satisfying Evidence Code section 1240 must still be nontestimonial if the witness was not unavailable or there was no prior opportunity to cross-examine. (*People v. Fayed* (2020) 9 Cal.5th 147, 168; cf. *People v. Blacksher, supra*, 52 Cal.4th at pp. 811, 813, 816-817 ["the touchstone questions are . . . whether the statement is otherwise admissible under a hearsay exception, and, if so, whether the statement is testimonial"].)

An objective analysis of the circumstances establishes the primary purpose of the discussion between Officer Stanionis and Stacy when she made statements implicating defendant was to the investigate possible past crimes. The past-present distinction is critical to the testimonial analysis—was the interrogation about what is happening or what happened? The bulk of their conversation here was about what happened. Stacy described how defendant approached her and Jamal while biking, assaulted her, and took their bikes and belongings. Stacy then said defendant threatened to kill her if she called the police. Unlike the 911 call in *Davis* or the dying victim's statements in *Bryant*, this does not pertain to anything happening at the time of the conversation, such as an ongoing emergency. Instead, like the abused wife in *Hammon*, these statements are exclusively past-looking pertaining to potential criminal conduct.

The statements at issue were not to address an ongoing emergency because defendant and Patrick were already detained some 50 to 75 yards away. Officer Stanionis testified she ensured defendant was detained before she began speaking with Stacy. And though she was not certain of Patrick's involvement, she knew officers were with her, so Patrick could not be an ongoing threat either way. Stacy also knew that Patrick had been detained as she identified Patrick as the person with police further down the bike trail. Both the interrogator and declarant therefore knew that all other parties involved in the incident were in police custody.

The lack of an ongoing emergency is further supported by a review of the body camera video. In the video, police are leaving the scene when Officer Stanionis first begins speaking with Stacy, and Officer Stanionis thanks a departing officer. This officer was heading in the opposite direction of the other group of officers that had detained defendant and Patrick, establishing the officer was not leaving to further assist in this incident. Additionally, another officer can be seen about 10 yards away with a notepad out interviewing Jamal, who is sitting down. The objective interpretation is that the

13

police officers believed the scene was secured, any emergency had abated, and they were now investigating what had happened.

Stacy was also not having an urgent medical emergency. Officer Stanionis testified at the evidentiary hearing one of the purposes of her initial contact with Stacy was to assess whether Stacy needed medical attention. Stacy said she was hurt, showing Officer Stanionis her neck where defendant held her, and Officer Stanionis noticed abrasions on her knees. However, Officer Stanionis must have determined no medical attention was needed because she never called for medical support throughout her interview with Stacy. Unlike the victim in *Bryant*, who police interviewed before medical support arrived while he was bleeding to death, there is no evidence Stacy ever needed or received any medical attention.

With all parties detained and no medical or any other ongoing emergency, there was no purpose for Officer Stanionis's discussion with Stacy other than to discuss possible past crimes, which is confirmed by Stacy's statements about defendant's earlier conduct.

The interrogation did, however, begin as an assessment for a possible emergency. As noted in *Davis*, nontestimonial statements can become testimonial when the emergency abates and the declarant begins to describe what *happened*, as opposed to what *is happening*. (*Davis, supra*, 547 U.S. at p. 830.) Officer Stanionis's testimony here shows this shifting. When Officer Stanionis arrived on the scene, she testified it was chaotic and she was responding to an ongoing emergency; this is supported by the other officers' testimony. But the scene changed from chaotic to calm when the officers detained defendant and Patrick and Officer Stanionis confirmed Stacy's medical situation and the absence of a gun. Officer Stanionis's questions "Are you hurt?" and "Who had a gun?" were objectively to assess the scope of a possible emergency. If Stacy required medical attention or a gun was on the scene, the purpose of the interrogation would likely have instead been to address those pressing concerns. But once Officer Stanionis

14

confirmed there was no medical emergency and no gun, the potential for an ongoing emergency ended. Stacy then began providing information on historical events. (See *Bryant, supra*, 562 U.S. at p. 365 ["This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency"].)

Even though Stacy may have still been under the influence of the recently concluded emergency, as evidenced by her rapid speech and stressed manner, the emergency no longer existed. The confrontation clause does not require declarants to be calm for statements to be testimonial. (Cf. *People v. Cage* (2007) 40 Cal.4th 965, 972, 991 [finding statements to police officer in a hospital where teenage victim still " 'seemed scared' " from recent stabbing were nonetheless testimonial and barred by the confrontation clause].)

Drawing the testimonial line at when Officer Stanionis asked "where did this all start," as the trial court did, improperly focuses on Officer Stanionis's subjective perspective. Officer Stanionis testified she generally begins taking witness statements by asking the witness when an incident started. But it is not determinative that Officer Stanionis had not asked substantive questions of Stacy until she asked this question because the testimonial inquiry is not wholly dependent on the interrogator's statements—"it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." (*Davis, supra*, 547 U.S. at p. 822, fn. 1.) Stacy was already explaining what had happened before Officer Stanionis asked the question, so asking Stacy "where did this all start" does not provide any independent indication that an emergency suddenly ended. The circumstances instead establish the question's purpose was to have Stacy start from the beginning so that Officer Stanionis could get the full picture in a coherent manner because Stacy was talking quickly and erratically. And if Officer Stanionis wanted information pertaining to an ongoing emergency, or some other purpose other than to investigate a crime, she

15

would have stopped Stacy from describing what happened and asked her questions assessing the scope of the emergency, such as whether there was anybody else remaining that posed a threat, like the officers in *Bryant*. Instead Officer Stanionis allowed Stacy to continue describing defendant's possible crimes, making sure Stacy took a breath and calmed down in order to provide the information. The line drawn by the trial court was therefore not properly tied to the considerations of the confrontation clause.

Finally, the formality of the interrogation is a further indicator of the testimonial nature of Stacy's statements. Formal interrogations at a police station are at the opposite end of a scale from informal interrogations at an evolving crime scene. This factor is also related to the emergency analysis—an interview during an emergency is less likely to have the indications of a formal interrogation. Here, like the emergency analysis, the manner in which the statements were taken displayed greater formality. Officers had already secured the scene by detaining defendant and Patrick. One officer was already speaking with Jamal and asked Officer Stanionis to speak with Stacy. Officer Stanionis testified the officer probably meant he wanted her to take Stacy's statement. They then walked 20 feet or so away to talk alone, apart from the other officer and Jamal. These circumstances evidence a shift from emergency abatement into a formal investigatory process. This is comparable to *Hammon*, where police interviewed the victim in her house in a separate room from the husband shortly after the domestic disturbance. The separation of witnesses after the conclusion of an emergency further indicates the collection of an investigatory statement, as opposed to information to assist in the emergency. This is dissimilar to the hurried on-scene interview in *Bryant*, where the victim was dying and the man who shot him was still at large and police were trying to quickly and informally gather information.

Overall, the circumstances here are much more like *Hammon* than *Davis* and *Bryant*. The interview may have started like *Davis* and *Bryant*, with a chaotic scene and an ongoing emergency. But after the suspects had been detained, the officers ensured

16

there was no gun, and ensured there was no medical emergency, the circumstances shifted towards the *Hammon* end of the spectrum and primarily became an investigation of what happened. We therefore find the primary purpose of Stacy's statements was to collect information about what happened for use in a later prosecution, even if it was the scene of a crime after a threatening situation. (See *Davis, supra*, 547 U.S. at p. 832 ["where [the wife's] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial"].)

**Conclusion**

We conclude Stacy's statements to Officer Stanionis after she informed her there was no gun were testimonial. Because Stacy was unavailable and defendant did not have an opportunity to cross-examine her, the statements were admitted in violation of defendant's confrontation rights.

We also conclude the violation of defendant's confrontation rights were prejudicial, and the People do not contend otherwise. Stacy's statements may have been the only evidence supporting defendant's conviction for witness dissuasion through force or fear, and likely supported the other convictions. As we cannot conclude the error was harmless beyond a reasonable doubt, we must reverse the conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.)[9]

---

[9] Because we find the statements testimonial, and therefore inadmissible, we need not address defendant's additional argument that the witness dissuasion conviction based entirely on one hearsay statement violates due process.

## DISPOSITION

The judgment is reversed, and the matter is remanded for retrial.[10]

/s/
RAYE, P. J.

We concur:

/s/
ROBIE, J.

/s/
MAURO, J.

---

[10] The People may retry defendant because the evidence, including that which was erroneously admitted, was sufficient to support defendant's conviction. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 40 [102 L.Ed.2d 265]; see *People v. Venegas* (1998) 18 Cal.4th 47, 95.)